United States District Court
Southern District of Texas
FILED

ιDEC   9 1994

Michael N. Milby, Clerk of Court



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICE SHARP, | § | CIVIL ACTION NO. H 94  4168 |
| Plaintiff, | § | |
| vs. | § | PLAINTIFF'S ORIGINAL |
| | § | COMPLAINT |
| | § | |
| THE CITY OF HOUSTON | § | |
| Defendants. | § | A JURY IS DEMANDED |

Officer Patrice Sharp brings this suit to challenge both the pervasive sexual harassment she has experienced as a police officer and the systematic retaliation to which she has been subjected for telling the truth about her treatment.

## PARTIES

1.      The plaintiff Patrice Sharp is an individual who resides in Friendswood, Galveston County, Texas.

2.      The defendant City of Houston is a political subdivision of the State of Texas, and may be served with process by serving the mayor of Houston, Robert Lanier, at 900 Bagby Street, 2nd Floor, Houston, Harris County, Texas.

## JURISDICTION

3.      This case is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

This Court has jurisdiction of this case according to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and 42 U.S.C. 2000e.

4.      Venue is invoked pursuant to 42 U.S.C. 2000e-5(f)(3).

1

## STATEMENT OF THE PLAINTIFF'S CASE

5.     The plaintiff, Patrice Sharp, began working for the City of Houston Police Department in May 1986.  After she graduated from her cadet training course, she successfully completed assignments at the jail and as a patrol officer.   In August 1989, she was assigned to the department's Mounted Patrol Unit where she experienced firsthand a darker side of the police department.

6.     In her assignment with the mounted patrol unit, Officer Sharp was repeatedly harassed by her two supervisors, Sergeant Edgar Bice and Lieutenant Wayne Hankins. Sergeant Bice, her direct supervisor, made numerous sexual comments regarding Officer Sharp's physical appearance that were totally inappropriate in a work setting.  For example, Sergeant Bice would often say, when Officer Sharp bent over to get something from a file in the mounted patrol offices, "hold that position, gal."  He also made numerous comments comparing Officer Sharp's breasts to "headlights" and suggested that she should enter a wet T-shirt contest.  These and similar comments of an offensive nature were repeated frequently.

7.     Further, when Officer Sharp sought his permission to deal with personal matters such as vacation time, child care related issues, and compensatory time, Sergeant Bice often remarked in response that he had keys to a hotel room and they could go there to discuss it.  He also repeatedly told her that the couch in his office made into a bed and suggested that Officer Sharp come into his office and close the door.  Each time this occurred, Officer Sharp made it very clear that she found these remarks inappropriate.

8.     In February 1993, Sergeant Bice engaged in a particularly disgusting action. While Officer Sharp sat in the offices of the Mounted Patrol Unit talking with another

2

ClibPDF - www.fastio.com

employee, Sergeant Bice crept up behind her, put his hands on her shoulders and kissed her in her right ear. Officer Sharp immediately relayed her shock and disgust to both Sergeant Bice and the employee who witnessed the event.

9.   Sergeant Bice's continuing offensive conduct and remarks, only a few of which are detailed in the preceding paragraphs, created an incredibly hostile work environment for Officer Sharp. Although she suffered greatly from the indignities of his treatment, she did not report these instances to Sergeant Bice's supervisor, Lieutenant Wayne Hankins, because that officer was engaging in the same type of inappropriate conduct.

10.   In the summer of 1992, for example, Lieutenant Hankins lowered his trousers purposefully to display the back of his underwear in front of several officers, including Officer Sharp. In the fall of 1992, Officer Sharp was subjected to incredibly demeaning treatment by Lieutenant Hankins at morning roll call. After Officer Sharp made a comment, Lieutenant Hankins walked over to where she was seated, put his crotch in her face and said something like "Well, if you have a problem" as he started undoing his pants. In early 1993, Lieutenant Hankins approached Officer Sharp as she was seated next to the receptionist's desk inside the mounted patrol office. After Officer Sharp asked him a question, he responded by grabbing his crotch and, shaking it, said something like "take care of this."

11.   Obviously, Lieutenant Hankins was hardly the kind of supervisor in whom Officer Sharp could confide. In addition to instances of the kind cited above, Lieutenant Hankins regularly cursed and harassed Officer Sharp about a variety of matters. His standard greeting to her and her partner was "Caught you fucking off again." He also told numerous offensive jokes at roll call.

3

12.     Officer Sharp thus had nowhere to turn.  From the time she began her training as a police officer, she has repeatedly heard the unwritten code of the department:  "Don't report any fellow officer for wrongdoing."  She also heard that, if she were ever involved in an Internal Affairs Department ("IAD") investigation, the best course of action was to not remember anything.  As were other police officers, Officer Sharp was very clearly and repeatedly informed of the danger of making any complaint about a fellow officer.  Further, Officer Sharp had witnessed the treatment given other police officers who complained about their treatment -- they were shunned, ridiculed, and generally received unfavorable treatment.  Chief Nuchia is well-aware that his subordinates, including high-level officials of the department, deal especially harshly with women and minority officers who assert their equal employment opportunity rights.  Unfortunately, he has allowed these individuals to continue their offensive practices.

13.     Officer Sharp was consequently well aware of the cost of taking a stand within the department.  Because she loved her assignment, she tried to ignore the offensive conduct of her supervisors and to avoid those men when possible.

14.     After Sergeant Bice's crude behavior in February 1993, however, Officer Sharp did speak in confidence about the situation with Sergeant J.W. Brown, the other sergeant assigned to the mounted patrol unit.  Officer Sharp spoke to Sergeant Brown in confidence because of her fear of retaliation.  Both she and her partner, Officer Monica Johnson, also asked to be transferred to Sergeant Brown's squad.  Although Sergeant Brown suggested that they discuss the incident with Lieutenant Hankins, Officer Sharp asked that this not be done given Lieutenant Hankins' equally offensive conduct.  Sergeant Brown nonetheless reported to

4

Lieutenant Hankins that there were problems involving Sergeant Bice and the two female officers in the unit and requested that these two officers be transferred to his supervision. That transfer did not take place, however, until after the whole situation came to light through the complaint of a fellow officer.

15.    In May 1993, one of Officer Sharp's fellow mounted patrol officers, Abel Devora, was transferred out of the mounted patrol unit. In response to what he felt was an unfair transfer, Officer Devora made a formal complaint about Sergeant Bice and Lieutenant Hankins. In Officer Devora's complaint, he raised, not only the discriminatory treatment he felt he had suffered because of his race, but detailed as well the sexual harassment that the plaintiff had suffered. Sergeant J.R. Dziedzic conducted the department's initial investigation and interviewed the plaintiff, among others, about Officer Devora's allegations.

16.    On July 21, 1993, after speaking with Sergeant Dziedzic, Sergeant Bice conducted a roll call for all mounted patrol officers in attendance during which he blatantly encouraged the mounted patrol officers to lie during the on-going investigation. He made his point by telling the officers three stories. First, he recounted an investigation that occurred while he was a motorcycle police officer. That particular investigation, he recalled, resulted in a big shake-up in the department because seven officers substantiated claims of wrongdoing. He thus warned the assembled officers that they should not follow the same route but instead "all stick together and they couldn't get any of us." He next revealed an incident in which he punched a prisoner in anger and broke four of his teeth. Before he and his partner were questioned separately about alleged brutality, his partner had advised him to stick to his "story" no matter what happened. Sgt. Bice claimed that this approach saved his job.

Finally, he revealed that a similar denial had allowed him to keep his job when he shot a sixteen year old.  Sgt. Bice underscored the seriousness of his advice by telling the officers that he had been around a long time and knew what he was talking about.  He also claimed that IAD works by making officers point fingers at each other, which eventually causes everyone to be transferred.  He told the officers that the unit's future depended on their choice and that they needed to "stick together."  The message was clear that deceit was the appropriate response to any investigation.  Bice further tried to intimidate Officer Sharp by stating that she was under investigation as well.

17.     Officer Sharp was shocked and disgusted at this blatant attempt at intimidation. She had, quite simply, had enough and was determined not to lie about the treatment she had received.  Her choice, however, has cost her dearly.  As Sergeant Bice predicted, most of her fellow officers responded to the initial investigation into Officer Devora's complaint by claiming that they could not remember anything about the allegations.  Officer Sharp was the only officer to substantiate any of Officer Devora's claims.

18.     The department's written procedures require that a complaint of violation of federal or state law -- which Officer Devora's complaint certainly contained -- be investigated by the Internal Affairs Division, unless otherwise directed by the Chief of Police, the Assistant Chief of the Professional Standards Command or the Deputy Chief of the Internal Affairs Division.  Despite this policy, the matter was not initially referred to the Internal Affairs Division.  Instead, Assistant Chief Dennis Storemski and Captain Dale Brown intentionally circumvented departmental orders in performing an "internal inquiry" of the matter.

6

19.     When Lt. Terry Collman of the Internal Affairs Division learned of the allegations included in Mr. Devora's complaint, he concluded that this was not appropriately a divisional matter and that, instead, it was a matter for the Internal Affairs Division.  In clear violation of departmental procedures, Captain Dale Brown thereafter called Lt. Collman and told him he could not pursue his investigation.  The Chief of Police, Sam Nuchia, initially agreed with this decision.  After a meeting with Assistant Chief Dennis Storemski and Captain Dale Brown, he stated that the investigation would stay in the division until Officer Sharp "comes clean."  He also stated that he was not going on any "witch hunt."  These inappropriate statements reveal that Chief Nuchia sanctions the longstanding policy of seeking to prohibit officers from petitioning to seek and obtain redress of grievances.  Rather than properly investigating the situation, the department's first approach is to attack the victim.

20.     The investigation was eventually upgraded from a divisional "inquiry" to an IAD investigation on July 28, 1993.  Indeed, it is Officer Sharp's husband, also a police officer, who called IAD to ask that they investigate the situation.  His call was prompted by a concern that Officer Sharp would be fired simply because no one else had the strength of character to tell the truth about the situation.  By this time, Officer Sharp had reported to IAD Sgt. Bice's attempts to tamper with the investigation.

21.     When IAD began its investigation, a few other officers did corroborate some of Officer Sharp's allegations.  After the IAD investigation was completed, Sergeant Bice and Lieutenant Hankins were suspended without pay for 90 days for their misconduct.  In a departure from previous department practice, however, Lieutenant Hankins was not prohibited from collecting income from a department-related extra job -- the security service he

ClibPDF - www.fastio.com

coordinated -- during the period in which he was relieved from duty or suspended from the department.

22.     In another departure from official departmental requirements, IAD did not seek guidance from the district attorney's office in connection with the allegations made against Hankins and Bice, which certainly smack of official oppression.  Further, IAD pressed Officer Sharp to soften her allegations about the department's previous knowledge of Lt. Hankin's misconduct by removing any reference to certain misconduct that had been reported to an IAD lieutenant.  This she refused to do.

23.     Although the perpetrators suffered very little, Officer Sharp has not been so fortunate.  The retaliation to which she has been subjected since that investigation ranges from shunning (i.e., other officers not speaking to her, turning their backs on her during roll call, placing her horse away from the other horses, and conducting roll call in the reception area while she remained in the roll call room) to even more egregious behavior (i.e., repeatedly removing her name from overtime functions and altering the tack on her horse). These behaviors started after Officer Sharp truthfully reported the sexual harassment to which she has been subjected.  She is clearly being punished for her honesty and her report of unlawful conduct.

24.     Officer Sharp repeatedly attempted to stop the retaliatory conduct by bringing the instances to the attention of her new supervisor, Sergeant Russell Chapman.  Sergeant Chapman had already informed Officer Sharp that he supported Hankins and Bice and that he was very upset that any adverse attention had come to the unit.  Further, based on the continuation of the offensive behavior, it clearly appears that he ignored, rather than ad-

8

ClibPDF - www.fastio.com

dressed, her complaints.  Unfortunately, his failure to condemn the retaliation only encouraged further retaliation.  Officer Sharp's concern was not merely that her work environment was tense; she was also concerned for her personal safety.  For example, one day in February 1994, Officer Sharp discovered that someone had tampered with the tack on her horse while she was at lunch.  Had she not noticed this before she tried to mount her horse, she could have been injured severely.

25.     Two specific incidents caused Officer Sharp such concern that she was forced to ask for a transfer from the mounted patrol unit, thus leaving a job she enjoyed.  First, on January 18, 1994, while en route to the Mounted Patrol offices and only a few blocks away, Officer Sharp was involved in a car accident.  The driver who caused the accident attempted to flee the scene.  After his vehicle became disabled, the plaintiff obtained driver's license information from the driver.  She promptly contacted the Mounted Patrol offices by cellular telephone and informed Officer Tony Vento that she had been involved in an accident and needed a unit check-by.  Even though this accident occurred only a few hundred yards from the Mounted Patrol offices, no one came to assist her.  After she telephoned Officer Vento a second time and asked for assistance, someone finally called the Houston Police Department dispatcher.  This incident was a chilling reminder that, because she violated the unwritten rule and spoke out, her fellow officers no longer considered her part of the unit.  During the four years that she has been with the Mounted Patrol, the officers had otherwise worked as a team to ensure one another's safety.  Had she not been ostracized in retaliation for her honest reports, an officer from Mounted Patrol would have come to her immediate assistance.

9

26.    Second, on January 27, 1994, the Mounted Patrol Unit held a banquet to honor the suspended supervisors, Lieutenant Hankins and Sergeant Bice.  During that banquet, to which Officer Sharp was not invited, Officers Tony Vento and Chuck Kennedy presented the two suspended supervisors with decorative Houston Mounted Patrol plaques in appreciation of their "service" to the department.  Officer Sharp understands that those attending the banquet included the suspended supervisors, their spouses, and approximately 15 officers from the mounted patrol unit.  This banquet was given during working hours and was attended by on-duty personnel, in direct violation of the department's rules.  This banquet made a mockery of the suspensions received by Lieutenant Hankins and Sergeant Bice.  Rather than being punished for their misdeeds, these supervisors were honored.  This banquet sent a clear signal from the department that the retaliation against Officer Sharp would not only continue, but escalate.  Despite violating departmental procedure by holding such a banquet at the tax-payer's expense, the officers who attended the banquet were not reprimanded.

27.    Officer Sharp has also learned that the Chief of Police sanctioned the treatment she had suffered.  In a meeting with Officer Sharp and her husband, Chief Nuchia in essence told Officer Sharp that it was her "destiny" to suffer retaliation for telling the truth.  Chief Nuchia also admitted that he knew that numerous officers in mounted patrol had lied during the investigation of Officer Devora's initial complaint.  The Chief took no disciplinary action against these individuals.  The Chief's knowledge of the deception and the retaliation makes it clear that the City is well aware of the consequences to an officer who gives truthful testimony in an investigation and the resulting danger to an officer with a conscience.  Officer Sharp has learned painfully that the City will not voluntarily change the unwritten custom of

10

punishing those who bring forward grievances about inappropriate treatment and protecting those who participate in egregious conduct.

28.    A further indication of the City's attitude was revealed when Officer Sharp's husband complained to Nuchia about the retaliation the plaintiff was suffering.  Although Chief Nuchia had earlier questioned why Officer Sharp did not bring her complaints about Bice and Hankins to him, when her husband made this report about retaliation to the Chief, Chief Nuchia blithely responded that he did not get involved in divisional matters.  He later said that, in his experience, it usually took at least one year for retaliation to decrease.  It is clear and unfortunate that only litigation against the City holds any promise to create a police department in which women are not routinely victimized and one in which honesty is appreciated rather than punished.

ClibPDF - www.fastio.com

## CAUSES OF ACTION

### Discrimination and Retaliation

29.     The defendants' conduct violates Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment on the basis of sex and retaliation against an individual who asserts her Title VII rights.

30.     The plaintiff timely filed charges of discrimination to challenge the sexual harassment and retaliation she has suffered.  She has received right to sue letters on each charge and timely files this lawsuit to vindicate her rights.

### Damages

31.  The damages suffered by the plaintiff include actual and compensatory damages for the injuries she suffered at the hands of the defendant, including, but not limited to, her mental anguish, and the devastating effect that the sexual harassment and retaliation have had and continue to have on her emotional stability.

### RELIEF REQUESTED

The plaintiff asks this court to enter a judgment:

1.  Declaring that the acts and practices complained of in this Complaint are in violation of Title VII;

2.  Enjoining and permanently restraining these violations of Title VII;

3.  Directing the defendant to pay plaintiff actual and compensatory damages that she suffered, past and future, in amounts that have yet to be ascertained;

4.  Awarding plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

5.   Awarding plaintiff the costs of this action, together with reasonable attorneys' fees and expert witness fees;

6.   Awarding plaintiff post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

7.   Awarding her such other relief, legal or equitable, as may be warranted.

Respectfully submitted,

OF COUNSEL:

Butler & Harris

3223 Smith, Suite 308

Houston, Texas  77006

Katherine L. Butler

State Bar No. 03526300

Margaret A. Harris

State Bar No. 09081400

3223 Smith, Suite 308

Houston, Texas  77006

(713) 526-5677

(713) 526-5691 (fax)

Attorneys for the Plaintiff

13

ClibPDF - www.fastio.com